## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GEORGE D. METZ II,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 1:22-CV-303-ECM-SMD** |
| | ) | |
| **SHERIFF DONALD VALENZA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Defendant Donald Valenza ("Valenza") submits this Memorandum of Law in support of his Motion for Summary Judgment (Doc. 43).

### INTRODUCTION

Plaintiff George D. Metz II ("Plaintiff") labels himself an "independent journalist/activist." (Doc. 1 at 7, ¶ 1). In reality, Plaintiff creates his own "news" by "film[ing] various government buildings . . . in what appears to be multiple attempts to provoke potentially unlawful police responses."[1] Plaintiff then posts the videos to his own YouTube channel, Rogue Nation.[2] Plaintiff titled the video of his encounter with Defendant, "BEDLAM, CHAOS, UNLAWFULLY DETAINED, 4TH VIOLATION!!!!." Bedlam and chaos were, in fact, occurring at the time. Defendant had received information just three days before that ANTIFA was planning to burn down multiple local law enforcement buildings, both Wal-Marts, and that ANTIFA members were

---

[1] Rec. of Magis. Judge at 1, *Metz v. Dodson*, No. 1:22-cv-303 (M.D. Ala. Feb. 22, 2023).

[2] A link to Plaintiff's YouTube Page and the video of his encounter with Defendant can be found here: https://www.youtube.com/watch?v=l78rWw7LmRI (last accessed Aug. 20, 2024).

likely to "map" out these locations. Plaintiff's title conveniently leaves out "forgery," "giving a false name to or address to a law enforcement officer," and "tampering with governmental records," though, as Plaintiff violated numerous Alabama criminal statutes when he signed the Houston County Sheriff's Office "Coronavirus Screening" Form with a false name in order to enter the Sheriff's Office. This is why Defendant approached Plaintiff and then detained him.

Plaintiff asserts two claims against Defendant, both under 42 U.S.C. § 1983. First, Plaintiff asserts a claim for "Illegal Seizure" under the Fourth Amendment and, second, for "1st Amendment retaliation claim." Defendant is entitled to summary judgment on both claims. Plaintiff cannot produce any evidence that Defendant violated Plaintiff's constitutional rights under the First or Fourth Amendment. In fact, the undisputed shows that Defendant had arguable reasonable suspicion to stop Plaintiff due to his forgery of the HCSO Coronavirus Screening form and his potential association with the threatened destruction of local government buildings and businesses. Moreover, Plaintiff cannot satisfy his burden of showing that Defendant violated the Plaintiff's clearly established statutory or constitutional rights. Accordingly, Defendant is entitled to qualified immunity and, in turn, summary judgment.

## UNDISPUTED FACTS

### A.    **Events Preceding June 4, 2020**:

On Monday, June 1, 2020, a caller called Houston County Sheriff's Office ("HCSO") advising they received information that the group ANTIFA was coming to Dothan and intended to burn down the Sheriff's Office, Police Department, and both Wal-Marts. (Ex. 1, Dec. of Donald Valenza, Doc. 44-1 at ¶ 3; *see also* Ex. 3, Dothan/Houston County 911 CFS Report, Doc. 44-3). At that time, the HCSO was on high alert status due to the violent protests occurring throughout the country, often targeting law enforcement personnel and property. (*Id.* at ¶ 4). Defendant, along

with other law enforcement, were aware that bad actors, including those associated with the ongoing destructive ANTIFA riots in other parts of the country, would typically attempt to "map" locations by videoing the locations prior to their destruction of the property. (*Id.* at ¶ 5).

**B.      Events of June 4, 2020 – Prior to Encounter with Defendant**:

On June 4, 2020, Plaintiff George Metz, along with his partner, came to Dothan, Alabama. (Doc. 44-1 at ¶ 6). That day, Plaintiff and his partner entered and attempted to film inside multiple government buildings in Dothan.

One of those buildings was the Houston County Sheriff's Office ("HCSO"). (*Id.* at ¶ 7). Under the Co-Vid policies and protocols in place at the time, Plaintiff and his partner were required to complete and sign a HCSO issued document related to their Co-Vid status. (*Id.* at ¶ 8). Plaintiff completed his form and submitted his form to the HCSO. (*Id.* at ¶ 9; *see* Ex. 2, Metz's Falsified Covid Screening Form, Doc. 44-2).

Plaintiff, however, (falsely) signed the form as "Wesley Curry Sr.". (Doc. 44-1 at ¶ 10; Doc. 44-2 at 2). Plaintiff also provided his driver license information which was recorded on the form. (*Id.*). Plaintiff's Florida Driver License indicated that his name was George Douglas Metz. (*Id.*). While in the HCSO, the two subjects declared they intended to video the inside of the Sheriff's Office, advised they were members of the press, but they were denied. (Doc. 44-1 at ¶ 11).

Plaintiff and his partner then attempted to film other Houston County buildings. Upon leaving the HCSO, the subjects attempted to enter Community Corrections but were denied. (*Id.* at ¶ 12). The subjects then attempted to enter and video the Houston County Administration Building but were denied. (*Id.* at ¶ 13). In addition, to his knowledge of Plaintiff providing two different names on his Coronavirus Screening Form and his attempt to video inside the HCSO and

other County buildings, Defendant received information the same two subjects were at the Department of Human Resource building earlier that day and Dothan Police Department responded. (*Id.* at ¶ 14).

Due to the Plaintiff's provision of a false name on a government document, and the ANTIFA threat, a "Be On The Lookout" ("BOLO") was issued for the two subject. (*Id.* at ¶ 15).

### C.      Events of June 4, 2020 – The Stop

At approximately 3:45 p.m., Defendant, while driving a Sheriff's office vehicle, located the two subjects who were videoing the backside of the Dothan Police Department. (*Id.* at ¶ 16). Defendant attempted to stop them at intersection of Adams and Appletree, but they ignored him. (*Id.*).Defendant then activated his blue lights which Plaintiff and his partner also ignored. (*Id.*). Defendant then engaged the air horn which they disregarded again. (*Id.*).Defendant then asked them to stop. (*Id.*). At that point, Plaintiff stopped and began videoing Defendant. (*Id.*).

Defendant exited his vehicle and asked Plaintiff "who [he was] with." (Compl. Ex., Doc. 1-1. at 1:35; Ex. 4, Video of Incident, Doc. 44-4). Plaintiff responded that he was "not with anybody." (*Id.*). Defendant asked if Plaintiff and his colleague were the "two that [came] from our building over there," to which Plaintiff replied, "Possibly." (*Id.* at 1:38). Defendant then said, "Well, you said you [were] with the media over there." (*Id.* at 1:43). Plaintiff acknowledged he had said he was with the media and asked why it mattered. (*Id.*). Defendant replied, "Well, I'm just concerned. You want to walk around and video." (*Id.* at 1:50).

Plaintiff asked Defendant if his act of videoing was illegal. (*Id.* at 1:54). Rather than answer, Defendant shifted his attention to Plaintiff's colleague and told him to "come back over here a minute." (*Id.* at 1:56). Plaintiff's colleague asked Defendant whether he was being detained,

to which Defendant replied, "I'm talking to you." (*Id.*). Plaintiff's colleague then said, "I don't care if you're talking to me. Am I being detained? It's not consensual." (*Id.* at 2:02). Plaintiff's colleague did not follow Defendant's command to come back, and Defendant returned his attention to Plaintiff. (*Id.* at 2:08).

The following exchange took place between Defendant and Plaintiff:

> Valenza: You got any ID on you? I just wanna see—let me see your ID and you can be on your way. I just wanna see—y'all said you were reporters over there.
>
> Plaintiff: Yeah, I'm with the media.
>
> Valenza: Well, let me see your credentials.
>
> Metz: I don't have to show any credentials unless I'm suspected of a crime.
>
> Valenza: Well, right now, we have something coming up, and we are, I'm asking you for your ID.
>
> Metz: Ok, do you suspect me of a crime?
>
> Valenza: We are doing an investigation.
>
> Metz: Is it an investigation of a crime?
>
> Valenza: Yes. Yes. Yes. Show me your ID.
>
> Metz: I don't have ID on me.
>
> Valenza: You don't have any ID on you?
>
> Metz: No. I'm not required to. Fifteen dash five dash thirty.[3]
>
> Valenza: Ok, you want to play, that's fine, you want to play, that's fine.... We have something we have concerns about. You're walking around videoing our administrative structures.
>
> Metz: Yeah. Absolutely.
>
> Valenza: And we have events coming up.
>
> Metz: I'm happy for you. I'm really happy for you. A lot of places have cancelled their events.

Valenza: They haven't here ... and that's why we're chatting.

Metz: If I'm doing something illegal, let me know and I'll provide you with my ID.

Valenza: Ok, you're doing something illegal right now by photographing government buildings.

Metz: From the public sidewalk?

Valenza: No, you went up to our door. You went up to our building, on our property.

Metz: Absolutely. It's public property. You're absolutely one hundred percent right.

Valenza: That's why I'm asking for your ID. Because you came in a government building, videoing, and ...

Metz: Is that illegal?

Valenza: Yes. In our opinion, yes. Because we have an investigation going on.

(*Id.* at 2:10–3:36).

During this exchange, three more law enforcement vehicles arrived, and two officers joined Defendant, one on either side. (*Id.* at 2:10–3:28). A third officer approached the group before walking over to speak with a fourth officer. (*Id.*). Defendant then turned to a law enforcement officer who had just arrived and asked, "These are the two?" (*Id.* at 3:37). He then said, "They don't seem to want to show ID. I told them, 'Show me ID and you can be on your way.' " (*Id.* at 3:43). Plaintiff responded, "Because we haven't broken the law." (*Id.*). Defendant reiterated that Plaintiff could "be on [his] way" by showing identification, and Plaintiff reiterated his reliance on "fifteen dash five dash thirty." (*Id.* at 3:49).

Defendant then instructed another law enforcement officer to get a photograph of Plaintiff, after which they would "let them go." (*Id.* at 4:11). Defendant told Plaintiff that they were not trying to harass him but they had concerns about them videoing because they had protests coming up. (*Id.* at 4:33). After commenting the protests may "very well ... be peaceful," he explained, "but

we've had some issues with the last one, and we're just concerned about you videoing our places—our government buildings." (*Id.* at 4:36).

Defendant continued: "You came in our building wanting to video; you went to our administration building wanting to video; and one of y'all had gone to the DHR wanting to video." (*Id.* at 4:56). "These are government structures, and right now, with everything going on, we're concerned about the government structures." (*Id.* at 5:07). After Plaintiff commented about the constitutional importance of the freedom of the press, Defendant replied, "You haven't shown me [anything] showing you *are* the press." (*Id.* at 5:13). "Show me your ID that you're the press and I told you that you could go." (*Id.* at 5:19).

Defendant's interaction with Plaintiff lasted approximately 4 minutes and 45 seconds from the time he exited his vehicle until he walked away from Plaintiff. (*Id.* at 6:05).

**D.    Defendant's Reason for Stopping Plaintiff**:

Defendant's reason for stopping the Plaintiff and his partner were two-fold: (1) Plaintiff's provision of a false name on the HCSO Co-Vid Screening Form; and (2) Plaintiff and his partner's potential association with the threat of a violent ANTIFA riot that Defendant learned of only three days before. (Doc. 44-1 at ¶ 18, ¶¶ 19-20). Defendant was aware that members of ANTIFA were known to "map" out locations by videoing the locations that they planned to destroy. (*Id.* at ¶ 5). Defendant suspected Plaintiff and his partner may have been "mapping" government buildings because Plaintiff was attempting to video inside these buildings. (*Id.* at ¶ 19). Indeed, Plaintiff and his partner attempted to video inside the HCSO and the Dothan Police Department—two of the buildings that were specifically threatened just three days earlier. (*Id.* at ¶ 3).

Defendant's suspicions were raised even further when he saw that Plaintiff had used a false name when signing his HCSO Coronavirus Screening Form. (*Id.* at ¶¶ 18, 20). In doing so, Defendant

believed Plaintiff committed a criminal act when Plaintiff signed and submitted the HCSO Coronavirus Screening Form under a false name. (*Id.* at ¶20). Indeed, Plaintiff's signing and submitting a government document to a law enforcement agency using a false name violates no less than five criminal provisions of the Alabama Code, some being a felony. (*Id.*).

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." A court presented with such a motion must grant it "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact can only be found "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). According to the Supreme Court, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

After the party seeking summary judgment satisfies this requirement, the burden shifts to "the adverse party [who] must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotations omitted) (citing Fed. R. Civ. P. 56(e)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (alteration in original). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). The Eleventh Circuit has held that "[a]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant . . . but an inference based on speculation and conjecture is not reasonable." *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) (citations omitted).

## ARGUMENT

Defendant should be granted summary judgment as to Plaintiff's §1983 claims against him as Defendant is entitled to qualified immunity. Plaintiff cannot establish that Defendant violated Plaintiff's clearly established constitutional rights. This is because Defendant possessed, at least, an arguable reasonable suspicion that Plaintiff committed a criminal act by signing an official government document with a false name. Defendant also possessed an arguable reasonable suspicion that Plaintiff and his partner, who, without explanation, attempted to video inside multiple government buildings, including the HCSO and Dothan Police Department just three days after Defendant received information that bad actors were planning to burn these two buildings and were likely to try and "map" these locations by videoing them beforehand. As a result, Defendant was justified in stopping Plaintiff and his partner and did not violate their clearly established rights.

Qualified immunity completely protects government officials sued in their individual capacities unless their conduct violates "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (internal quotes and citation omitted). The Eleventh Circuit explains that "[u]nless

the government official's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity." *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (2003). Qualified Immunity is a powerful doctrine that provides a true "*immunity from suit rather than a mere defense to liability[.]*" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis original).

The purpose of qualified immunity is to allow government officials to carry out their duties without fear of personal liability or harassing litigation. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The doctrine "prevents public officials from being intimidated—by the threat of lawsuits that jeopardize the official and her family's welfare personally—from doing their jobs." *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation[.]" *Mitchell*, 472 U.S. at 526. Therefore, the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). *See also Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) ("[b]ecause of the purpose served by the doctrine of qualified immunity, a valid defense based upon it must be recognized as soon as possible, preferably at the motion to dismiss or summary judgment stage").

"The applicability of qualified immunity is a question of law to be decided by the court." *Willingham v. Loughman*, 261 F.3d 1178, 1184 (11th Cir. 2001). To receive qualified immunity at the summary judgment stage, a government official must first show that he was engaged in a discretionary function when he engaged in the conduct at issue. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004). Once the official satisfies his initial burden, the burden of proof then shifts to the plaintiff to show that qualified immunity is not appropriate.

*Id.* Challenged actions are within the scope of an official's discretionary authority when they were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority. *Hinson*, 927 F.3d at 116; *Gray v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006). In applying this test " 'a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.' " *Id.* (quoting *Harbert Int'l v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)).

Here, Defendant was on duty investigating suspicious activity—Plaintiff using a false name when signing an official government document and inexplicably filming government buildings that had been threatened just three days prior—and responding to a BOLO when he encountered Plaintiff outside of the police building and allegedly violated his constitutional rights. Therefore, Defendant was acting within the scope of his discretionary authority and is entitled to qualified immunity. *Hinson*, 927 F.3d at 116 ("Defendant Officers readily satisfy [the discretionary authority] requirement, as they undertook all of the challenged actions while on duty as police officers conducting arrests and investigative functions.").

As a result, the burden shifts to Plaintiff to overcome Defendant's immunity. *Id.* To do so, he must produce evidence that, when viewed in the light most favorable to him, shows that (1) Defendant violated his constitutional rights, and (2) it was clearly established at the time of the incident that Defendant's actions were unconstitutional. *Maddox*, 727 F. 3d at 1120. The clearly established inquiry is undertaken "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court has discretion to address the two prongs of the qualified immunity analysis in whatever order "will best facilitate the fair and efficient disposition of each case" and may "determine that the right allegedly violated was not clearly established without deciding whether a constitutional violation occurred at all." *Pearson v.*

*Callahan*, 555 U.S. 223, 242 (2009); *Maddox*, 727 F.3d at 1121. Plaintiff must satisfy both prongs of the qualified immunity test in order to remove the Defendant's qualified immunity. *See Barnett v. City of Florence*, 409 F. App'x 266, 270 (11th Cir. 2010).

## I.     Defendant is entitled to qualified immunity as to Plaintiff's Fourth Amendment claim.

To remove Defendant's qualified immunity, Plaintiff must prove that Defendant violated his constitutional rights. He cannot. The undisputed evidence shows Defendant possessed an arguable reasonable suspicion to stop Plaintiff. As a result, Defendant did not violate Plaintiff's Fourth Amendment rights.

The Fourth Amendment bars "unreasonable searches and seizures." U.S. Const. Amd. IV. Police may "seize" a person for a brief investigatory *Terry* stop[3] when (1) they have reasonable suspicion that the person was, or is about to be, involved in criminal activity, and (2) the seizure is reasonably related in scope to the circumstances justifying it in the first place. *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). The reasonable suspicion necessary for a *Terry* stop "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). However, "the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* Police "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 123-24 (internal quotes and citation omitted). Courts should look to the totality of the circumstances when determining if police had reasonable suspicion, *Jordan*,

---

[3] A *Terry* stop is "a brief, warrantless, investigatory stop of an individual" that is less intrusive than an arrest. *United States v. Lester*, 477 F. App'x 697, 698 (11th Cir. 2012).

635 F.3d at 1187, and when conduct is susceptible to both an innocent and a suspicious explanation, an "officer[ ][can] detain the individual[ ] to resolve the ambiguity," *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

When articulating their suspicion, officers may rely on "collective knowledge." Indeed, reasonable suspicion may exist based on the collective knowledge of law enforcement officials derived from reasonably trustworthy information. *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) (applying collective knowledge of law enforcement to find that the officers had probable cause to make an arrest for purposes of qualified immunity); *see also Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012) ("The fellow officer rule, sometimes referred to as the collective knowledge doctrine, allows the collective knowledge of police investigating a crime to be imputed to each member of the investigation. The reach of this doctrine has been extended to searches as well as arrests."). In addition, "officers may rely on alleged victims' statements as support for probable cause, *Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998), and they are not "required to sift through conflicting evidence or explanations or resolve issues of credibility when assessing probable cause," *Huebner v. Bradshaw*, 935 F.3d 1183, 1188 (11th Cir. 2019) (quotation marks omitted)." *Watkins v. Bigwood*, No. 22-10875, 2023 WL 3711827, at *4 (11th Cir. May 30, 2023). The realm of knowledge officers may rely on includes calls to a 911 dispatcher. *See United States v. Wehrle*, No. CR406-333, 2007 WL 521882, at *4 (S.D. Ga. Feb. 14, 2007) ("the Court concludes that the information known to [the dispatcher] through her communication with [the 911 caller] is properly imputed to [the police officer in the field] and considered as part of the reasonable suspicion calculation"); *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1118 (9th Cir. 2003) ("Although

the Highway Patrol dispatcher distilled and paraphrased this information in passing it on to Officer Schock, the dispatcher's knowledge is properly considered as part of our analysis of reasonable suspicion.").

Here, the undisputed evidence shows Defendant possessed an arguably reasonable suspicion to stop Plaintiff and his partner. At the time of the stop, Defendant knew that Plaintiff had used a false name when he signed the HCSO Coronavirus Screening Form. The HCSO Coronavirus Screening Form was created and issued by the HCSO and thus constituted an official government document or record. *See* Ala. Code § 13A-10(1)(4) (defining "governmental record," in relevant part, as "[a]ny record, paper, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government.").When Plaintiff signed the Form with a false name, he violated no less than five Alabama criminal statutes criminalizing the forging, falsification, tampering and obstruction of official government records or law enforcement records:

- § 13A-9-3(a)(3) – Forgery in the second degree;

- § 13A-9-4(a) – Forgery in the fourth degree;

- § 13A-9-18.1(a) – Giving of False name or address to a law enforcement officer;

- § 13A-10-2(a) – Obstructing governmental operations; and

- § 13A-10-12(1) – Tampering with governmental records.

*See also Sizemore v. State*, 847 So. 2d 970, 974 (Ala. Crim. App. 2002) (holding that defendant committed forgery by giving police officer a false name for a uniform traffic ticket and signing that person's name on an instrument to be filed in a public office); *Sims v. State*, 733 So. 2d 926, 930 n. 1 (Ala. Crim. App. 1998) (noting "[a] person commits the crime of giving a false name or address to a law enforcement officer [under § 13A-9-18.1] if the person gives a false name or

address to a law enforcement officer in the course of the officer's official duties with intent to mislead the officer."). Thus, independently and by itself, the fact that Plaintiff provided a false name when signing the HCSO Coronavirus Form provided Defendant with at least an arguable reasonable suspicion to stop Plaintiff (and, actually, probable cause to arrest Plaintiff).

Defendant's arguable reasonable suspicion was bolstered by Plaintiff attempting to film inside government buildings which Defendant knew had been specifically threatened via a tip received through the 911 system. In addition, Defendant knew that the bad actors who posed the threat were likely to video and scout the locations before attempting to damage the buildings. While Plaintiff and his partner claimed at the HCSO that they were members of the press, Plaintiff had also just provided a false name on an official HCSO Form. Plaintiff had no reason to sign the Form with a false name which cast serious suspicion on Plaintiff's intent and motive behind filming inside the threatened government buildings. These facts, together, gave Defendant an arguable reasonable suspicion that Plaintiff had engaged in criminal activity and may do so in the near future.

Defendant's investigatory stop of Plaintiff was lawful. "The principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop." *Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 187 (2004) (affirming conviction for failure to identify during lawful *Terry* stop). "Obtaining a suspect's name in the course of a *Terry* stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder." *Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 186 (2004). Indeed, "questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Id.*

Alabama authorizes such a stop. Under § 15-5-30, also known as Alabama's "stop-and-identify statute," an Alabama police officer who "reasonably suspects" a crime is being, has been, or is about to be committed to stop a person in public and "demand of him his name, address and an explanation of his actions." *See Edger v. McCabe*, 84 F.4th 1230, 1238 (11th Cir. 2023). And Alabama courts recognize that "[i] Inherent in an officer's right to stop a suspect and demand his name, address, and an explanation of his actions is the right to detain him temporarily to verify the information given or to obtain information independently of the suspect's cooperation". *Walker v. City of Mobile,* 508 So.2d 1209 (Ala.Cr.App.1987). Federal courts are in accord: "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officers at the time." *Hayes v. Florida*, 470 U.S. 811, 816 (1985).

Here, Defendant took the most reasonable approach in light of the facts know to him and other officers at the time. Defendant asked multiple times for Plaintiff's identification, credentials, or something to verify his identity. Plaintiff refused multiple times. Defendant also asked Plaintiff for "an explanation of his actions," to assess Plaintiff's association with the recent threat to burn government buildings. Assuming Defendant's entire interaction with Plaintiff was an investigatory stop, the interaction lasted less than five minutes.

Thus, looking to the totality of the circumstances, Defendant conducted a permissible *Terry* stop because (1) he had a reasonable suspicion Plaintiff was involved in, and about to be involved in, criminal activity, and (2) the stop was reasonable related in scope to the circumstances which justified the stop in the first place. *See United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). Accordingly, Defendant is entitled to qualified immunity and, in turn, summary judgment

because Plaintiff cannot satisfy his burden of proving the Defendant violated his Fourth Amendment rights.

Alternatively and independently, Defendant is also entitled to qualified immunity because Plaintiff cannot prove that it was clearly established that Defendant's conduct violated his Fourth Amendment rights. In short, there is not a single legal authority establishing or a reasonable person that could conclude Defendant, armed with knowledge of Plaintiff's provision of a false name and attempt to video inside government buildings, violated Plaintiff's Fourth Amendment rights when Defendant stopped Plaintiff or during the stop. Indeed, the Eleventh Circuit has said that "reasonable suspicion of criminal activity may be formed by observing *exclusively legal activity* even if such activity is seemingly innocuous to the ordinary citizen." *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007) (emphasis added) (internal quotations and citations omitted). The Court "may not consider each fact only in isolation, and reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation.'" *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)).

Even if Plaintiff had not forged the HCSO Form, Defendant's stop of Plaintiff was reasonable in light of the specific and timely threat to the HCSO and Police Department. The Supreme Court has made it abundantly clear that, although an individual may ultimately be engaged in conduct that is perfectly lawful officers may "detain the individual[ ] to resolve the ambiguity." *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673 (citing *Terry*, 392 U.S. at 30, 88 S.Ct. 1868); *see also United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct."); *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ("The Fourth Amendment does not require *1305 a policeman who lacks the precise level of information

necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."). As the Court put it in *Wardlow:*

> *Terry* accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. The *Terry* stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further.

528 U.S. at 126, 120 S.Ct. 673.

Plaintiff cannot produce any contrary authority. As a result, Plaintiff cannot satisfy his burden under the second prong of the qualified immunity analysis. Accordingly, Defendant is entitled to summary judgment as to the Fourth Amendment claim.

## II.     Defendant is entitled to qualified immunity as to the First Amendment Retaliation claim.

Because qualified immunity bars Plaintiff's Fourth Amendment claim, Plaintiff's First Amendment claim is also barred as it hinges on the legality of Defendant's alleged seizure of Plaintiff. *See J.S. v. Campbell*, 2:05-cv-928-WKW, 2006 WL 2864254, at *3 (M.D. Ala. Oct. 5, 2006) ("Under the law of the Eleventh Circuit, Plaintiff's First Amendment claim hinges on the legality of his detention under the Fourth Amendment.") (compiling cases). This Court previously recognized this principle in this very case. *See* Doc. 22 at 8 ("Under the law of the Eleventh Circuit, a First Amendment claim hinges on the legality of the plaintiff's detention under the Fourth Amendment."); *see also Redd v. City of Enterprise,* 140 F.3d 1378, 1383 (11th Cir. 1998) (explaining that when a police officer has probable cause to believe that a person is committing a particular public offense, the officer may lawfully arrest that person, even though the offender is engaged in protected First Amendment activity). Thus, because Defendant's investigatory stop of Plaintiff was reasonable and, therefore, lawful, Defendant did not violate

Plaintiff's First Amendment rights even assuming his conduct was protected First Amendment activity.

Alternatively, Plaintiff cannot meet his burden of proving Defendant violated his clearly established constitutional rights. First, Plaintiff cannot satisfy his burden of proving Defendant violated his First Amendment rights because Plaintiff cannot produce any evidence that Defendant stopped Plaintiff due to an improper motive or that Defendant's alleged retaliation was the "but-for" cause of the stop. Indeed, the undisputed evidence shows that Defendant stopped Plaintiff because Plaintiff provided a false name when signing the HCSO Form. The undisputed evidence also shows that Defendant stopped Plaintiff to investigate Plaintiff's potential association with the recent and specific threat of damage to government buildings. Accordingly, Plaintiff's First Amendment retaliation claim cannot survive summary judgment because there is no evidence that Defendant acted with an improper, retaliatory motive or that such a motive was the exclusive "but-for" cause of Plaintiff's stop.[4]

Second, Plaintiff cannot satisfy his burden of showing that it was clearly established that Defendant's conduct violated Plaintiff's First Amendment rights. There are no materially similar cases or generally applicable principles of law that clearly establish Defendant violated

---

[4] In *Nieves*, the Supreme Court hypothecated that an exception to this rule may exist where "a plaintiff presents *objective evidence* that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 139 S. Ct. at 1717 (emphasis added). In *DeMartini v. Town of Gulf Stream,* 942 F.3d 1277, 1296-97 (11th Cir. 2019), the Eleventh Circuit characterized this potential exception as "dicta." "The law cannot be established by dicta." *Hamilton ex rel. Hamilton v. Cannon,* 80 F.3d 1525, 1530 (11th Cir. 1996). "Dicta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law." *Id.* Thus, the Supreme Court's hypothetical exception cannot strip [the officer] of qualified immunity. In any event, the complaint does not plead factual allegations that plausibly demonstrate the existence of such "objective evidence." *Nieves*, 139 S. Ct. at 1717.

Plaintiff's rights. This includes *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

In *Smith*, the Court said that "[t]he First Amendment protects the right to gather information about

what public officials do on public property, and specifically, a right to record matters of public

interest." *Id.* This is too general a statement to satisfy the clearly established law standard. As the

Eleventh Circuit recognized in *Crocker v. Beatty*, *Smith* unhelpfully discusses the law at a high

level of generality:

> First, there is the Supreme Court's oft-repeated instruction "not to define clearly
> established law at a high level of generality." *Ashcroft*, 563 U.S. at 742, 131 S. Ct.
> 2074. With that negative injunction comes a positive command to ask "whether the
> violative nature of *particular* conduct is clearly established." *Mullenix*, 577 U.S. at
> 12, 136 S. Ct. 305 (quotation marks omitted). And we must answer that question
> "in light of the specific context of the case, not as a broad general
> proposition." *Brosseau*, 543 U.S. at 198, 125 S. Ct. 596 (quotation marks omitted).
> Given that guidance, it seems to us that *Smith*'s lack of explanation remains more
> vice than virtue for the purpose of clearly establishing the law here.

*Crocker v. Beatty*, 995 F.3d 1232, 1241 (11th Cir. 2021); *see also Williams ex rel. Williams v.*

*Carter*, No. 5:21-CV-510-LCB, 2023 WL 158219, at *4 (N.D. Ala. Jan. 11, 2023) ("a plaintiff

cannot overcome qualified immunity on a First Amendment retaliation claim merely by citing

*Smith*"). Due to its lack of detail, *Smith* cannot clearly establish the law in these circumstances.

*See Crocker v. Beatty*, 995 F.3d 1232, 1241 (11th Cir. 2021) ("The dearth of detail about the

contours of the right announced in *Smith* undermines any claim that it provides officers 'fair

warning' under other circumstances.").

Indeed, *Smith* is inapplicable to the facts of this case. *Smith* applied to conduct solely in the

context of a traditional public forum, i.e. on a public side walk or roadway. While Defendant

stopped Plaintiff on a sidewalk, Defendant was also aware that Plaintiff had attempted to film

inside government buildings including the HCSO, the jail, and a county administrative building.

These are all non-public forums. *Daniel v. City of Tampa*, 38 F.3d 546, 549 (11th Cir. 1994) ("[A]

nonpublic forum is public property which is not by tradition or designation a forum for public communication, and limits on access to such need only be reasonable and not based upon a desire to suppress a certain viewpoint."). There is no First Amendment right to film in a nonpublic forum. *See Rice v. Kempker*, 374 F.3d 675, 678 (8th Cir. 2004) ("we hold that neither the public nor the media has a First Amendment right to videotape, photograph, or make audio recordings of government proceedings that are by law open to the public"); *Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 184 (3d Cir. 1999) ("We conclude that Whiteland Woods' right of access to Planning Commission meetings did not create a federal constitutional right to videotape the meetings."); *Kerr v. City of Boulder*, No. 19-CV-01724-KLM, 2021 WL 2514567, at *10 (D. Colo. June 18, 2021) ("Plaintiffs did not have a constitutionally protected right to film on Jail property, and therefore, . . . Plaintiffs have failed to establish the first element of their First Amendment retaliation claim."); *Sheets v. City of Punta Gorda*, 415 F. Supp. 3d 1115, 1123 (M.D. Fla. 2019) ("the Ordinance places reasonable restrictions on recording at City Hall given its purpose and context"); *Kushner v. Buhta*, No. 16-CV-2646 (SRN/SER), 2018 WL 1866033, at *11 (D. Minn. Apr. 18, 2018) ("Kushner did not have the right to record interactions between police and protesters at the Halbertal lecture."), *aff'd*, 771 F. App'x 714 (8th Cir. 2019). Plaintiff has previously litigated this issue and lost:

> By this point, the First Amendment right to record police activity in public is probably clearly established. *E.g.*, *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). This right is "subject to reasonable time, manner and place restrictions." *Id.* Yet the right to record within a government building or nonpolice public employees working inside a government building is another matter. In a recent, similar case, neither the parties nor the Court could not find any controlling law on that point. *Sheets v. City of Punta Gorda, Fla.*, No. 2:19-cv-484-FtM-38MRM, 2019 WL 6251361 (M.D. Fla. Nov. 23, 2019). If a courtroom full of lawyers found the contours of this purported right unsettled after exhaustive research and argument, the Court will not hold Hines to a higher standard. *See Coffin*, 642 F.3d at 1015 ("[I]t would be inappropriate to hold government officials to a higher level of knowledge and understanding of the legal landscape than that

displayed by judges whose everyday business it is to decipher the meaning of judicial opinions." (citation omitted)). There are thus no allegations for the violation of a clearly established right.

*Metz v. Hines*, No. 219CV424FTM38MRM, 2019 WL 6716180, at *3 (M.D. Fla. Dec. 10, 2019).

This Court itself prohibits photography and filming in "any portion of the United States courthouse buildings and the exterior steps to such buildings, and parking areas adjacent to such buildings if such areas are owned by the United States Government." (M.D. Ala. Civil. Misc. No. 3046.) There are no time, place, or manner exceptions to this Court's blanket prohibition. "We must not hold police officers to a higher standard of legal knowledge than that displayed by the federal courts." *Youmans v. Gagnon*, 626 F.3d 557, 565 (11th Cir. 2010).

Thus, there is no authority that clearly establishes Defendant's stop of Plaintiff was a clearly established violation of the Plaintiff's rights. This is true even assuming Defendant did not know of Plaintiff's forgery of an official government document. Under that scenario, Defendant may have stopped Plaintiff while he was filming in a traditional public forum but only did so because Plaintiff had attempted to video in multiple public buildings and there was a specific and recent threat to those buildings. It is not the other way around. As a result, *Smith* is both too general and factually inapposite to clearly establish Defendant's conduct violated Plaintiff's First Amendment rights. Accordingly, Defendant is entitled to qualified immunity and, in turn, summary judgment.

**CONCLUSION**

Defendant is entitled to qualified immunity on both of Plaintiff's claims asserted against him. Plaintiff cannot produce any evidence that Defendant violated Plaintiff's First or Fourth Amendment rights. In fact, the undisputed evidence shows that Defendant had an arguable and articulable reasonable suspicion to stop Plaintiff and the stop was within the scope of this suspicion. Plaintiff cannot satisfy his burden of producing authority clearly establishing

Defendant's conduct violated his rights either. As a result, Defendant is entitled to qualified immunity. Accordingly, Defendant respectfully asks that this Court grant him summary judgment as to both claims asserted against him.

Respectfully submitted, this 20th day of August, 2024.

**/s/C. Richard Hill, Jr.**
C. RICHARD HILL, JR. (HIL045)
ASHLEY H. FREEMAN (FRE044)

Capell & Howard, P.C.
150 South Perry Street (36104)
P.O. Box 2069
Montgomery, AL 36102-2069
Telephone: (334) 241-8043
Facsimile:(334) 241-8243
Email: rick.hill@chlaw.com
       ashley.freeman@chlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 20th day of August 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and have placed a copy of it in the United States Mail, postage prepaid to the following:

George D. Metz, II
4980 SE 140th Street
Summerfield, Florida 34491

**/s/C. Richard Hill, Jr.**
OF COUNSEL