**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **GEORGE D. METZ II,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | CASE NO.: 1:22-CV-303-ECM-SMD |
| ) | |
| **SHERIFF DONALD VALENZA,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Defendant Donald Valenza ("Valenza") submits this Reply Brief in support of his Motion for Summary Judgment (Doc. 43).

**OBJECTION TO PLAINTIFF'S EVIDENCE**

Pursuant to Federal Rule of Civil Procedure 56(c)(2), Defendant objects to the following evidence that Plaintiff submitted in opposition to Defendant's motion for summary judgment: (A) Facebook page screen shot—Doc. 49-1; (B) Declaration in Support of Opposition—Doc. 53; (C) to the extent that the video does not depict the events in their entirety, Video of Plaintiff at the Houston County Sheriff Office, Doc. 49-2, and Video of Plaintiff's Encounter with Defendant, Doc. 1-1; and (D) Video cited in Footnote 1 of Plaintiff's Response—Doc. 49, 6 n.1.

    A.    **Facebook Screenshot – Doc. 49-1**

Defendant objects to Plaintiff's submission of the screenshot of a Facebook page purportedly for Wesley Curry, Sr. because this material cannot be presented in a form that would be admissible in evidence.

1

First, the screenshot is not authenticated and does not meet any exceptions allowing the document to be considered at the summary judgment stage. *See Bozeman v. Orum*, 199 F. Supp. 2d 1217, 1222 (M.D. Ala. 2002). The authenticity of the screenshot is not clear on its face. Plaintiff has not submitted any affidavit, declaration, testimony, or other evidence that authenticates the document or indicates that it could be authenticated at trial. Similarly, Defendant objects to the screenshot as hearsay to the extent that Plaintiff submits the screenshot of the Facebook page to support the existence of Wesley Curry, Sr., or his presence at the HCSO the day that Plaintiff visited. Plaintiff has no first-hand knowledge that the Facebook page belongs to Wesley Curry, Sr., much less that he was present at the HCSO on June 4, 2020. Plaintiff has not otherwise submitted evidence that shows he would be able to show the existence or presence of Wesley Curry, Sr. at trial. Accordingly, Defendant respectfully requests that this Court not consider this material when deciding Defendant's motion for summary judgment.

### B.     Plaintiff's Declaration in Support of Opposition – Doc. 53

Defendant objects to Plaintiff's Declaration in Support of Opposition (Doc. 53) because it was untimely filed. In this Court's August 21, 2024 Order & Notice, (Doc. 46), this Court expressly ordered "that, **on or before September 11, 2024**, Plaintiff shall file a written response and show cause, if any there be, why the [Defendant's Motion for Summary Judgment] should not be granted." *Id.* at 1 (emphasis in original). Moreover, this Court declared that "[a]ny documents or evidence filed after the applicable deadline will not be considered by the Court absent a motion demonstrating good cause." *Id.* Plaintiff filed his declaration after the applicable September 11, 2024 deadline. *See* Doc. 53. Plaintiff did not submit a motion asking this Court to consider his untimely filing, or otherwise submitted anything demonstrating good cause for his violation of this Court's Order & Notice.

Plaintiff's status as a *pro se* litigant does not excuse his non-compliance with the requirements set forth in this Court's Order & Notice. "[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." *Clement v. McCarley*, 708 F. App'x 585, 588 (11th Cir. 2017) (quoting *McNeil v. United States*, 508 U.S. 106, 113(1993)). Indeed, the Eleventh Circuit has upheld a district court's adoption of a defendant's statement of facts at the summary judgment stage because the *pro se* plaintiff failed to comply with the formatting requirements of the applicable local rules. *See id.* In this case, Plaintiff did not merely submit his statement of facts in the incorrect format, but failed to submit a declaration and a statement of disputed facts altogether before the Court-ordered deadline. *See* Doc. 53. Accordingly, Defendant respectfully asks this Court to strike Plaintiff's untimely Declaration and not consider it when deciding Defendant's Motion for Summary Judgment.

### C. Videos of Plaintiff's Interaction at the HCSO & with Defendant – Docs. 1-1 & 49-2

Defendant objects to Plaintiff's Videos of Plaintiff's Interaction at the HCSO and with Defendant (Docs. 1-1, and 49-2) to the extent Plaintiff argues they support facts that are not shown in the videos. For example, Plaintiff contends that "Plaintiff's exhibit 1," presumably Doc. 1-1, "completely destroys" Defendant's assertion that he attempted to stop Plaintiff at the intersection of Adams and Appletree and then activated his blue light which Plaintiff ignored. Doc. 53 at 5, ¶5. According to Plaintiff, from the video, "you can clearly hear/see [Defendant] didn't try to stop us until he blew his horn." Doc. 53 at 5, ¶ 5. The video, however, does not depict these events as the video turns on only a few moments before Defendant engaged his air horn. *See* Doc. 1-1.

Likewise, Plaintiff's claim that "Plaintiff's exhibit #2," presumably Doc. 49-2, shows that he never submitted a Covid form may be correct, but the video does not support the implied

assertion that he never submitted a form. The video doesn't show Plaintiff filling out the form, but it is clear from the audio Plaintiff filled a form out by the sound of him writing. It also doesn't show that Plaintiff took the form with him. So, at minimum, it is reasonable to believe that Plaintiff, in fact, submitted a Covid form. If he didn't, then it is a reasonable explanation as to the confusion that Plaintiff claims occurred regarding his submission of a Covid form under a false name since he clearly filled a form out.

Last, Plaintiff argues that his video of his and the Defendant's interaction, Doc. 1-1, shows that his detainment lasted 28 minutes. *See* Doc. 53, 6; Doc. 49, 7. The video clearly shows, though, that Defendant's interaction with the Plaintiff lasted approximately 4 minutes and 45 seconds from the time he exited his vehicle until Defendant walked away from Plaintiff. *See* Doc. 1-1 at 6:05. Any detainment beyond five minutes is attributable to other officers and not Defendant. Indeed, toward the end of Defendant's interaction with Plaintiff, other units, including Officer Dodson with Dothan Police, arrived. *See* Doc. 44-1 at ¶ 17(f). Officer Dodson, who is not a deputy or a subordinate of the Sheriff, specifically advised Defendant that Dodson had probable cause to arrest Plaintiff. *Id.* at ¶ 17(g). After Officer Dodson advised that he had probable cause to arrest Plaintiff, Defendant explained to Plaintiff that "with the violent protests occurring through out the country, I hope he understood why its important for us to ID you both." *Id.* at ¶ 17(i). With that, Defendant walked away and no longer detained Plaintiff. Accordingly, Plaintiff's video may show that his overall detainment lasted 28 minutes, but it also shows that Defendant's detainment of Plaintiff lasted less than 5 minutes.

In short, the videos Plaintiff submitted as evidence do not show the whole picture and, therefore, cannot support factual assertions outside of what the video shows. So, this Court should

4

not consider the videos as evidence to the extent Plaintiff attempts to use piecemeal video in an attempt to support his version of events that are not depicted.

      **D.**      **"County Administration" Video cited in Plaintiff's Response – Doc. 49, 6 n.1**

In Footnote 1 of Page 6 of Plaintiff's Response, Plaintiff cites to a video that he describes as "County Administration video on my channel." Doc. 49, 6 n.1. The linked video is entitled "A WILD HERD OF BOOTLICKERS STAMPEDED THE COPS!!!". *See id.* (emphasis in original). Plaintiff failed to submit this video as evidence and did not do so in accordance with this Court's Order & Notice, *see* Doc. 46. Accordingly, Defendant objects to this evidence and requests that the Court not consider it when deciding Defendant's motion for summary judgment.

## MATERIAL FACTS

Plaintiff admits that he is "not able to address what happened five days prior to my arrival." *See* Doc. 49, p. 2. Therefore, it is undisputed that less than 96 hours before Plaintiff visited Dothan, an individual, identifying himself as Jimmy Adkins, called the Houston County Sheriff's office advising that he had received information that the group ANTIFA was coming to Dothan and intended to burn down the Sheriff's Office, Police Department, and both Wal-Marts.[1] *See* Doc. 44-1, ¶ 3; Doc. 44-3, p. 2. At that time, the HCSO was on high alert status due to violent protests occurring throughout the country and the Defendant, along with other law enforcement, were

---

[1] Plaintiff is correct that the Report, Doc. 44-3, indicates the call was made on May 31, 2020 and was made at approximately 8:00 p.m. *See* Doc. 44-3, p. 2. While the Sheriff's affidavit states the call was made the next day, the Sheriff the discrepancy is understandable due to the length of time that has passed since the incident occurred and that he was likely only made aware of the call the following day since it was made late at night. Regardless, the minor discrepancy of a few hours is not material to the issue of whether the Sheriff possessed arguable reasonable suspicion to stop and investigate the Plaintiff's actions related to government that had been specifically threatened just days prior and his potential forgery of the HCSO-issued Covid form.

aware that bad actors, including those associated with ANTIFA would typically attempt to scout locations by videoing targeted locations ahead of their destruction of property. *See* Doc. 44-1, ¶ 5.

On June 4, 2020, Plaintiff, along with his partner, arrived in Dothan and began videoing public buildings, including the DHR building, the HCSO, the police department, the post office, and the county administration building. *See* Doc. 44-1 at ¶¶ 7, 16, 19; *see also* Doc. 53, p. 2, ¶ 4.[2] Under the Houston County Sheriff's Office Covid 19 policies and protocols that were in place at the time, Metz and his partner were required to complete and sign an HCSO-issued document related to their Covid status. *See* Doc. 44-1, ¶ 8.

After being asked to complete the Covid form by a deputy, Plaintiff admits he completed a Covid form, but "does not recall submitting it." Doc. 53, p. 2, ¶ 6.[3] Plaintiff disputes that he signed the form with the name "Wesley Curry, Sr.,"  and that he showed his driver license at the HCSO that day. *See* Doc. 49, p. 3; *see also* Doc. 53, p. 2, ¶¶ 6-7. However, according the Defendant, he believed that Plaintiff signed under the false name of "Wesley Curry, Sr." Doc. 44-1, ¶ 10. And while Plaintiff states that he did not show his license, Defendant understood that Plaintiff provided his license information and that it conflicted with the name he signed on the form. *See id.* Defendant was not present while Plaintiff signed this form or was present in the HCSO, though, his deputies were. *See* Doc. 49-2, 1:08-8:30.

---

[2] Defendant maintains his objection to the consideration of Plaintiff's Declaration when deciding Defendant's motion for summary judgment. Defendant cites to Plaintiff's Declaration in the alternative and maintains that the facts submitted by Plaintiff are not material to the outcome of this case.

[3] Despite not recalling whether submitted the Covid form after filling it out, Plaintiff later claims that the video shows he didn't. *See* Doc. 53, p. 5, ¶ 2. However, it is not clear from the video footage what exactly happened to the form—whether he submitted the form, left it on the deputy's desk after filling it out, or took it with him—as after Plaintiff is heard writing on the form, the form is never shown in the video footage again. *See* 49-2,  1:38-8:30.

After Plaintiff left the HCSO and attempted to film inside two other government buildings, a "Be on the lookout" ("BOLO") was issued for Metz and his partner due to Plaintiff's provision of a false name on the HCSO-issued Covid form and the potential link to the ANTIFA threat called in just a few days before. Doc. 44-1, ¶ 15. After the BOLO was issued, Defendant encountered the subjects while they were videoing the backside of the Dothan Police Department. *Id.* at ¶ 16. Defendant attempted to stop Plaintiff and his partner multiple times but was ignored until he engaged his air horn at which point Plaintiff stopped. *Id.* at ¶ 16.[4]

After stopping, Defendant and Plaintiff engaged in a conversation during which the following material events occurred or was said:

- Defendant asked to see Plaintiff's ID, but Plaintiff refused;

- Defendant advised he was conducting "an investigation,";

- Defendant identified Plaintiff and his partner as the two subjects who had just been at the HCSO and identified themselves as members of the press;

- Defendant then requested to see press credentials but was denied;

- Defendant then advised them of the threats to local property and that he just wanted to see who they really were;

- Other units arrived, including Dothan Police Officer Dodson, who advised Defendant he had probable cause to arrest Plaintiff; and

---

[4] Plaintiff disputes this fact citing the first minute of his video of his encounter with Defendant. *See* Doc. 53, p. 5, ¶ 5 (citing Doc. 1-1, 0:05-1:08). However, Defendant does not appear show Defendant pulling up until he engages his air horn and already has his blue lights on. No other events are shown before that. The only evidence of Defendant's actions immediately preceding the video is the testimony contained in his declaration. Accordingly, this facts should not be considered disputed for purposes of summary judgment.

7

- Defendant stated that it was important to ID Plaintiff and his partner due to ongoing violent protests occurring throughout the country at the time.

*See* Doc. 44-1, ¶ 17. While Plaintiff claims that Defendant only stopped him because he was gathering information, Defendant stated multiple times during the interaction that he was concerned with Plaintiff's filming of government structures and the existing threats to those structures, *see* Doc. 1-1, 1:00-5:45. Indeed, the evidence in the record shows that Defendant stopped Plaintiff due to the information contained in the BOLO, i.e., Plaintiff's reportedly signing the Covid form with a false name, and the threat to the Sheriff's Office and Dothan Police Department called in days earlier. Doc. 44-1, ¶ 18, 19. Other law enforcement personnel communicate this to Plaintiff after the Sheriff leaves, thus corroborating the Sheriff's reason for stopping Plaintiff. *See* Doc. 1-1, 15:00-18:00. The Defendant's detainment of Plaintiff lasted less than five minutes. *See* Doc. 1-1.[5]

## ARGUMENT

Defendant is entitled to qualified immunity. Plaintiff does not contest that Defendant was acting within his discretionary authority when Defendant approached Plaintiff. *See* Doc. 49; Thus, it was Plaintiff's burden of overcoming Defendant's immunity and may only do so by showing that (1) Defendant violated his constitutional rights, and (2) it was clearly established that Defendant's actions were unconstitutional at the time. *See Hinson v. Bias*, 927 F.3d 1103, 116 (11th Cir. 2019). Plaintiff has not carried this burden.

---

[5] Plaintiff disputes this because, according to Plaintiff, his detainment lasted at least 28 minutes. Doc. 49, p. 7; Doc. 53, pg. 6, ¶ 1. His entire detainment with law enforcement may have lasted that long. But, as Plaintiff's own video shows, Defendant walked away and had no further interaction with Plaintiff after approximately four minutes and forty-five seconds at which point other law enforcement personnel arrived, including members of the state police and Dothan police, and took over. *See* Doc. 1-1.

This case turns on whether the evidence shows that Defendant had an arguable reasonable suspicion that Plaintiff committed, or was about to commit, a crime. To prove Defendant's detainment violated Plaintiff's clearly established Fourth and First Amendment rights, Plaintiff was required to show that Defendant lacked arguable reasonable suspicion to stop Plaintiff. *See Hargis v. City of Orlando, Fla.*, 586 F. App'x 493, 499 (11th Cir. 2014) (internal citation omitted). Whether that suspicion existed is assessed by considering the totality of the circumstances to determine whether the detaining officer had a particularized and objective basis for suspecting criminal activity. *Id.* The level of potential suspected criminal activity is less than the standard of probable cause. *Id.* And whether the necessary particularized and objective basis for suspecting such activity is judged based on the information available to the officer at the time of the stop, not information that the officer might later discover. *S.S. ex rel. Montgomery v. Bolton*, 522 F. App'x 453, 455 (11th Cir. 2013) (citing *United States v. Lewis*, 674 F.3d 1298, 1305 (11th Cir. 2012)). Even though a suspect maybe engaged in perfectly lawful activity, if there is any reasonable question as to criminal implications of that conduct, officer may detain the individual to resolve the ambiguity. *See Lewis*, 674 F.3d at 1304.

It is undisputed that Defendant stopped Plaintiff after a BOLO was issued as to Plaintiff and his partner for the (disputed) forgery and provision of a false name at the HCSO and their potential connection with the threats to the Sheriff Office, Police Department, and other buildings in the area that was called in just days before Plaintiff visited Dothan. Plaintiff filmed the very buildings that the HCSO were tipped off as threatened, i.e., the Sheriff's Office and the Police Department. Defendant knew that members of ANTIFA, the group who intended to damage or destroy those exact building according to the tip, were likely scout these locations ahead of time by videoing and photographing these buildings. Thus, Plaintiff's conduct was consistent with the

9

tip and information known to law enforcement and the Defendant at the time. Moreover, according to the information that was relayed to law enforcement via the BOLO that was issued after Plaintiff left the Sheriff's Office, Plaintiff had provided a false name when signing the Covid form, a government issued document, when he attempted to film inside the Sheriff's Office. Based on this information that Defendant knew at the time, Defendant had an arguable reasonable suspicion that Plaintiff had committed a crime—forging a government issued document—or were about to commit a crime—scouting or planning the destruction of the Sheriff's Office and Police Department.

Plaintiff asserts that the tip regarding the threats to the Sheriff's Office and the Police Department were too general, attenuated, unrelated to Plaintiff's activity that day, and were required to be corroborated to be deemed credible enough for the tip to serve as a basis for stopping Plaintiff. This is incorrect. First, the tip was not required to be corroborated. The case law Plaintiff relies on deals exclusively with *anonymous* tips, which require corroboration. *See Adams v. Williams*, 407 U.S. 143, 146-147 (1972) (distinguishing between anonymous tip cases and cases involving known tipsters). But in this case, the caller identified himself. *See* Doc. 44-3. Plaintiff is also incorrect that the tip was too general and there was no connection between the tip and his conduct. If Plaintiff had been filming other local buildings, or even other government buildings then Plaintiff may be right, but the tip identified specific potential suspects (members of ANTIFA) and specific buildings. Moreover, Plaintiff had already filmed and was filming the exact buildings mentioned in the tip when Defendant stopped Plaintiff. And "mapping" these buildings via filming and photographing them was the exact type of conduct Defendant knew ANTIFA were likely to undertake prior to damaging a targeted building. The tip was not stale either. It had occurred only a few days before Plaintiff arrived in Dothan. Accordingly, Plaintiff's potential association with

the tip, by itself, warranted further investigation and provided Defendant with arguable reasonable suspicion to stop Plaintiff.

Plaintiff also disputes that his alleged forgery of the Covid document provided a false basis for stopping him. Even accepting Plaintiff's version of events, this does not overcome Defendant's qualified immunity. The material facts are those that were known by Defendant at the time he stopped Plaintiff. Defendant was not present when Plaintiff filled out the Covid form. The information he had was based on information gathered from other officers and the BOLO, in particular. Thus, for all Defendant knew, Plaintiff had just committed a crime by submitting a government-issued document under a false name. Again, this fact, by itself, warranted further investigation and provided Defendant with arguable reasonable suspicion to stop Plaintiff. Even more so when considered together with Plaintiff's conduct that was consistent with the threat to the Sheriff's Office and the Police Department. Accordingly, Defendant's suspicion of Plaintiff was at least arguably reasonable and, thus, deserving of qualified immunity.

Performing a *Terry* stop to investigate Plaintiff's potential criminal activity, instead of arresting Plaintiff and asking questions later, is the very purpose of such a stop. As the Supreme Court explained, the interest of "effective crime prevention and detection," the Court explained, "underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968).

Indeed, the stop was reasonable in light of its purpose. Contrary to Plaintiff's arguments in response, Defendant's request for Plaintiff's identification was directly related to the purpose of his detainment and could provide the information that a *Terry* stop is designed to provide:

> Obtaining a suspect's name in the course of a *Terry* stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another

11

> offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere. Identity may prove particularly important in cases such as this, where the police are investigating what appears to be a domestic assault. Officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.

*Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 186 (2004). In addition, the length of the stop was well within reason. *See United States v. Purcell*, 236 F.3d 1274, 1277-79 (11th Cir. 2001) (14 minute stop permissible); *United States v. Place*, 462 U.S. 696, 709-10 (1983) (stating that 90 minutes is probably too long for a *Terry* stop).

Plaintiff has not pointed to any materially similar case law clearly establishing that Defendant's conduct violated Plaintiff's rights under the known to Defendant at the time of the stop. And Plaintiff's general principles cannot serve as a basis for clearly established law. *See Turner v. Lieutenant Driver*, 848 F.3d 678, 686 (5th Cir. 2017) ("the Supreme Court has 'repeatedly' instructed courts 'not to define clearly established law at a high level of generality': 'The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.'"). While Plaintiff may have a first amendment right to gather information, that right is not absolute. *See Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017) (recognizing the right to record police may be subject to "reasonable time, place, and manner restrictions"); *Chestnut v. Wallace*, 947 F.3d 1085, 1096 (8th Cir. 2020) (Gruender, J., dissenting) (noting in the context of a citizen's right to watch and record the police that "the fact that a certain right exists does not mean it is without limits, nor does it necessarily indicate that it is obvious how that right applies to a certain set of facts"); *see also Robbins v. City of Des Moines*, 984 F.3d 673, 678 (8th Cir. 2021) ("Robbins' behavior that went beyond any constitutionally protected recording activity when combined with the officers' knowledge about vehicles being stolen and

vandalized in the area and the previous filming that led to officers being murdered could cause an objectively reasonable person in the officers' position to suspect Robbins was up to more than simply recording the police. Under these circumstances, we can neither say that the officers' conduct was objectively unreasonable under clearly established law, nor in violation of the First Amendment.").

## CONCLUSION

Defendant is entitled to qualified immunity because an arguable reasonable suspicion existed to justify his detainment of Plaintiff and the detainment was reasonable in its scope and manner. Plaintiff has not produced any evidence disputing the facts that were known to Defendant at the time and supported his suspicion of Plaintiff. Moreover, Plaintiff has not pointed to any law clearly establishing Defendant's detainment of Plaintiff violated his constitutional rights. As a result, Defendant respectfully requests this Court grant his motion for summary judgment on Plaintiff's First and Fourth Amendment claims against him.

Respectfully submitted, this 25th day of August, 2024.

/s/C. Richard Hill, Jr.
C. RICHARD HILL, JR. (HIL045)
ASHLEY H. FREEMAN (FRE044)

Capell & Howard, P.C.
150 South Perry Street (36104)
P.O. Box 2069
Montgomery, AL 36102-2069
Telephone: (334) 241-8043
Facsimile:(334) 241-8243
Email: rick.hill@chlaw.com
         ashley.freeman@chlaw.com

13

**CERTIFICATE OF SERVICE**

      I hereby certify that on this the 25th day of August 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and have placed a copy of it in the United States Mail, postage prepaid to the following:

George D. Metz, II
4980 SE 140th Street
Summerfield, Florida 34491


                                            **/s/C. Richard Hill, Jr.**
                                            OF COUNSEL